THIS OPINION IS A
PRECEDENT OF THE TTAB
Mailed:
February 27, 2012
Bucher

**UNITED STATES PATENT AND TRADEMARK OFFICE**
————

**Trademark Trial and Appeal Board**
————

Research in Motion Limited

v.

Defining Presence Marketing Group, Inc. and Axel Ltd. Co.
————

Opposition Nos. 91178668, 91179490 & 91181076
against Serial Nos. 77059205, 77059214, 77059232 & 77179267
————

Jeffrey J. Morgan, William R. Towns and Monica M. Moussighi
of Novak Druce + Quigg LLP for Research in Motion Limited.

Matthew W. Swyers of The Swyers Law Firm PLLC for Defining
Presence Marketing Group, Inc. and Axel Ltd. Co.[1]
————

Before Bucher, Zervas and Ritchie, Administrative Trademark
Judges.

Opinion by Bucher, Administrative Trademark Judge:

Defining Presence Marketing Group, Inc. (DPMG) filed

four separate applications for registration on the Principal

Register of the mark **CRACKBERRY** *(in standard character*

*format)* for goods and services described as follows:

"marketing services, namely providing
informational web pages designed to generate sales

---

[1] All four of these applications were assigned from Defining Presence Marketing Group, Inc., a Canadian corporation, to Axel Ltd. Co., a Florida limited liability corporation, as of September 7, 2007, recorded in the United States Patent and Trademark Office Assignment Division at Reel 3617, Frame 0992. The Board joined Axel as a party defendant in an order dated February 12, 2008. We refer to both defendants as "applicants."

traffic via hyperlinks to other websites; online retail store services featuring downloadable ring tones; online retail store services featuring consumer electronics and telecommunication products and accessories; providing online directory information services also featuring hyperlinks to other websites" in International Class 35;[2]

"computer services, namely, creating an online community for registered users to participate in competitions, showcase their skills, get feedback from their peers, form virtual communities, engage in social networking and improve their talent; computer services, namely, redirecting electronic mail to changed personal electronic address" in International Class 42;[3]

"providing online chat rooms and electronic bulletin boards for transmission of messages among users in the field of general interest; providing online chat rooms for transmission of messages among computer users concerning telecommunications, mobile telephony, e-mail, mobile phones, PDAs and wireless communications; providing general and non-consumer information online in the field of telecommunications, mobile telephony, e-mail, mobile phones, PDAs and wireless communications" in International Class 38;[4] and

"headgear, namely, hats and caps; jackets; coats; dress shirts; polo shirts; shirts; shirts for suits; sport shirts; sweat shirts; t-shirts; denims; pants; sweat pants; board shorts; boxer shorts; shorts; sweat shorts; skirt suits; skirts and dresses; bathing suits; body suits; dress suits; jogging suits; boxer briefs; lingerie;

---

[2]    Application Serial No. 77059205 was filed on December 7, 2006, based upon DPMG's allegation of a *bona fide* intention to use the mark in commerce, opposed in Opposition No. 91178668.
[3]    Application Serial No. 77059214 was filed on December 7, 2006, based upon DPMG's allegation of a *bona fide* intention to use the mark in commerce, opposed in Opposition No. 91178668.
[4]    Application Serial No. 77059232 was filed on December 7, 2006, based upon DPMG's allegation of a *bona fide* intention to use the mark in commerce, opposed in Opposition No 91179490.

socks; beach shoes; canvas shoes; shoes; gym shorts" in International Class 25.[5]

Research in Motion Limited [hereinafter "opposer" or "RIM"] opposed registration of applicants' mark in each of these applications, asserting as its grounds for opposition, (i) likelihood of confusion, namely that as used in connection with applicants' goods and services, the mark so resembles RIM's previously used and registered **BLACKBERRY** mark as to be likely to cause confusion, to cause mistake, or to deceive under Trademark Act Section 2(d), 15 U.S.C. § 1052(d); and (ii) dilution, namely, that applicants' mark is likely to dilute the distinctive quality of opposer's marks under Trademark Act Section 43(c), 15 U.S.C. § 1125(c)(2)(B). Opposer alleges that it has used its **BLACKBERRY** marks in connection with "handheld devices including smart phones and related goods and services as well as promotional and collateral goods"; and that its **BLACKBERRY** marks are famous for RIM's array of goods and services, and were famous before any of applicants' priority dates. Opposer also pleaded ownership of several registrations for **BLACKBERRY** or **BLACKBERRY**

---

[5] Application Serial No. 77179267 was filed on May 11, 2007, based upon DPMG's allegation of a *bona fide* intention to use the mark in commerce, opposed in Opposition No 91181076.

formative marks in its notice of opposition, including

Registration Nos. 2613308, 2672464, 2700671 and 2844339.

Applicants have filed answers denying the salient

allegations of the notices of opposition, and pleaded

affirmative defenses, which defenses were not pursued at

trial.  The affirmative defenses are considered waived and

are given no further consideration.

The record includes the pleadings; the files of the

involved applications; opposer's first notice of reliance

filed on March 9, 2009, which introduced into the record

TARR printouts of a number of opposer's pleaded

registrations for its **BLACKBERRY** marks;[6] opposer's second

notice of reliance, also filed on March 9, 2009, which

introduced into the record applicants' answers and

objections to opposer's first set of interrogatories;

opposer's third notice of reliance filed on August 7, 2009,

which introduced into the record printed publications;

opposer's fourth notice of reliance also filed on August 7,

2009, which introduced into the record the Declaration of

James Yersh, with the attendant exhibits;[7] and opposer's

---

[6]    Although opposer also alleged that it has used and
registered marks other than BLACKBERRY that incorporate the
suffix –BERRY, opposer submitted no argument on this point, and
we give it no further consideration.
[7]    Applicants have stipulated that financial information may be
entered into evidence in the form of the Yersh Declaration.

testimony deposition of Lee Potter, Director, Brand Communications for RIM, with the attendant exhibits.

Applicants submitted their notice of reliance on October 9, 2009, as well as testimony depositions of applicants' witnesses, Kevin Michaluk, co-founder and principal of Defining Presence Marketing Group, Inc., and Ronald Butters, Ph.D., an expert in the fields of linguistics, with the attendant exhibits.

The parties entered into a joint stipulation on March 4, 2011.[8]  The parties have fully briefed the issues still involved in this litigation.

### *STANDING*

Copies of United States Patent and Trademark Office records submitted by opposer show that opposer is the owner of the following valid and subsisting registrations:[9]

| BLACKBERRY | for "electronic handheld units for the wireless receipt and/or transmission of data, that enable the user to keep track of or manage personal information; software for the redirection of messages, global computer network e-mail, and/or other data to one or |

---

[8]  The joint stipulation states that "BlackBerry-branded ads were placed on Applicants' web site between November 1, 2009 and February 24, 2011," that "the ads were not placed directly by Opposer" but by intermediaries, and that "There is no evidence of actual confusion from the ads …."

[9]  Opposer's Notice of Reliance #1 filed on March 9, 2009, included printouts of information from the TARR electronic database records of the United States Patent and Trademark Office showing the current title and status of its **BLACKBERRY** registrations at that time.  TTABVue entry #20.

| | |
|---|---|
| | more electronic handheld units from a data store on or associated with a personal computer or a server; and software for the synchronization of data between a remote station or unit and a fixed or remote station or unit" in International Class 9;[10] |
| **BLACKBERRY** | for "e-mail service; wireless data messaging services, particularly services that enable a user to send and/or receive messages through a wireless data network; one-way and two-way paging services" in International Class 38;[11] |
| **BLACKBERRY** | for "electronic handheld units for the wireless receipt and/or transmission of data that enable the user to keep track of or manage personal information and which may also have the capacity to transmit and receive voice communications; software for the redirection of messages, global computer network e-mail, and other data to one or more electronic handheld units from a data store on or associated with a personal computer or a server; software for the synchronization of data between a remote station or unit and a fixed or remote station or unit and software which enables and provides one-way and two-way wireless connectivity to data, including corporate data" in International Class 9; "e-mail service; wireless data messaging services, particularly services that enable a user to send and/or receive messages through a wireless data network; one-way and two-way paging services; transmission and reception of voice communication services; consultation on the topics of developing and integrating one-way or two-way wireless connectivity to data, including corporate data, and/or communications" in International Class 38; "educational services, namely, classes, seminars and conferences for the purpose of providing information to third parties to assist them in developing and integrating one-way or two-way wireless connectivity to |

---

[10]    Registration No. 2672464 issued on January 7, 2003; Section 8 affidavit accepted.
[11]    Registration No. 2700671 issued on March 25, 2003; Section 8 affidavit accepted.

| | |
|---|---|
| | data, including corporate data, and voice communications" in International Class 41;[12] |
| **BLACKBERRY CONNECTION** | for "newsletter relating to internet e-mail services and wireless data messaging services and voice communication services and technical support services for hardware and software for wireless data network services and voice communication services" in International Class 16;[13] |
| **BlackBerry** | for "electronic handheld units and accessories therefore , namely, batteries, cases, battery chargers, holsters and antennas, for the wireless receipt and/or transmission of data and which may also have the capability to transmit and receive voice communications, namely handheld computers and personal digital assistants; computer communications software for the transmission and/or reception of messages, global computer network e-mail, and/or other data between one or more electronic handheld units and a data store on or associated with a personal computer or a server; computer communication software for the synchronization of data between a remote station or unit and a fixed or remote station or unit and software which enables and provides one-way and/or two-way wireless connectivity to data, including corporate data" in International Class 9; "e-mail service; wireless data messaging services, particularly services that enable a user to send and/or receive messages through a wireless data network; one-way and two-way paging services; transmission and reception of voice communication services" in International Class 38; and "consulting and educational services namely, classes, seminars and conferences for the purpose of providing information to third parties to assist them in developing and integrating one way or two way wireless connectivity to data, including corporate data, and/or voice communications" in International Class 41.[14] |

---

[12]  Registration No. 2844340 issued on May 25, 2004; Section 8 affidavit accepted and Section 15 affidavit acknowledged.
[13]  Registration No. 3098588 issued on May 30, 2006.
[14]  Registration No. 3102687 issued on June 13, 2006.

- 7 -

Having established it is the owner of these registrations and that they are valid and subsisting, opposer has established its standing to oppose applicants' applications.

## *PRIORITY*

As to opposer's allegations of likelihood of confusion, due to opposer's registered marks for the goods identified in International Classes 9 and 16, and opposer's services recited in International Classes 38 and 41, opposer's priority as to these goods and services is not in issue. *King Candy Co. v. Eunice King's Kitchen, Inc*., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

## LIKELIHOOD OF CONFUSION

### *Parody/Fair Use defense to finding of Likelihood of Confusion*

Applicants assert that they should prevail on the question of likelihood of confusion inasmuch as their mark is a parody of opposer's mark.  In some reported infringement cases from the federal courts, a successful parody seems to make confusion less likely.  *See Hormel Foods Corp. v. Jim Henson Productions Inc*., 73 F.3d 497, 37 USPQ2d 1516, 1519-22 (2d Cir. 1996) [Henson's use of "Spa'am" on merchandise for its "*Muppet*" movie is not likely

to cause confusion with Hormel's **SPAM** mark for luncheon meat]. Furthermore, when federal courts are dealing with questions of alleged infringement, the protective penumbra of free speech may well support the premise that members of the public have a right to use words in the English language to interest and amuse other persons. However, when this Board is asked the narrower question of applicants' right to registration under Section 2(d) of the Lanham Act, the First Amendment claim is not as strong as with issues of restraint on use. The center of balance changes even further when the risk of confusion of source, affiliation, approval, or endorsement by the source of the known expression outweighs the newcomer's claim to the right to adopt and register a humorous moniker. Especially if we should find under the *du Pont* factors that the respective goods and services are not readily distinguishable, that they might be targeted to the same consumers through overlapping trade channels, and in the event that prospective purchasers of applicants' goods and services might well believe that both parties' goods and services come from the same source, then the likelihood of confusion will usually trump any First Amendment concerns. *See Starbucks U.S. Brands, LLC and Starbucks Corporation D.B.A. Starbucks Coffee Company v. Marshall S. Ruben,* 78 USPQ2d 1741, 1754 (TTAB 2006)

[**STARBUCKS** versus **LESSBUCKS** for coffee]; and *Columbia Pictures Industries, Inc. v. Miller,* 211 USPQ 816, 820 (TTAB 1981) [**CLOSE ENCOUNTERS OF THE THIRD KIND** for T-shirts versus **CLOTHES ENCOUNTERS** for items of clothing].

### *The du Pont Factors*

Accordingly, we turn to a consideration of the question of likelihood of confusion. Our determination of likelihood of confusion is based upon our analysis of all of the probative facts in evidence that are relevant to the factors bearing on this issue. *See In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

The salient question to be determined is whether there is a likelihood that the relevant purchasing public will be misled to believe that the goods and/or services offered under the involved marks originate from a common source. *See J.C. Hall Company v. Hallmark Cards, Incorporated*, 340 F.2d 960, 144 USPQ 435 (CCPA 1965); and *The State Historical Society of Wisconsin v. Ringling Bros.-Barnum & Bailey Combined Shows, Inc*., 190 USPQ 25 (TTAB 1976). Opposer must establish by a preponderance of the evidence that there is a likelihood of confusion. *Crash Dummy Movie LLC v. Mattel Inc*., 601 F.3d 1387, 94 USPQ2d 1315, 1316

(Fed. Cir. 2010).  The relevant *du Pont* factors in the proceeding now before us are discussed below.

### *Fame of Opposer's Mark*

In January 1999, at the time of its adoption and first use, opposer's **BLACKBERRY** mark was and continues to be clearly arbitrary as applied to its goods and services, and from the outset was entitled to protection as a source indicator.  A decade later, by the time of the current trial, opposer argues that whether one looks to metrics like the volume of sales, extensive promotional and advertising expenditures, the length of use of the **BLACKBERRY** mark, the role of this historically-significant device in shaping the culture and technology of the early twenty-first century, and/or evidence of widespread media attention, the **BLACKBERRY** mark has become famous and well known.[15]

The fame of a mark, if it exists, "plays a 'dominant role' in the process of balancing the *du Pont* factors." *Recot Inc. v. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000).  Because of the extreme deference that is accorded to a famous mark in terms of the wide latitude of

---

[15]    *See* opposer's Notice of Reliance #1, exhibits 1-3, 8-11; Potter trial deposition at 13-14, 38-45, and exhibits 25, 31-33; Notice of Reliance #3, PP0002-11, PP00017, PP00021, PP00028 and PP00032; Butters Trial Deposition at 29; and Notice of Reliance #4, Yersh Declaration at ¶5.

legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of a party asserting that its mark is famous to prove it definitively. *Leading Jewelers Guild Inc. v. LJOW Holdings LLC,* 82 USPQ2d 1901, 1904 (TTAB 2007).

Although the actual numbers are confidential, RIM has sold billions of dollars worth of **BLACKBERRY** branded products and services in the United States since 1999, reaching an ever-increasing number of millions of consumers in the United States each year through fiscal year 2009,[16] based in part upon RIM having spent many tens of millions of dollars on advertising and promotion. These promotional efforts have included print advertising, television and radio advertisements, signage, billboards, banners, brochures and other printed materials, as well as Internet websites. The record also demonstrates how unsolicited media coverage has added to the renown of the **BLACKBERRY** mark. Over the past decade, **BLACKBERRY** has repeatedly been ranked among the most famous and valuable trademarks in the world by industry publications that track the powerful reach of global brands.[17] We are convinced by reliable

---

[16] Based on ¶ 5 of the Declaration of James Yersh, Vice President and Controller of RIM, as of August 3, 2009.

[17] *See* testimony of Lee Potter as well as opposer's related Exhibit # 31, Interbrand's "Best Global Brands 2008," submitted with, Bates No. RIM009602, TTABVue Entry #54 at 153 of 291;

evidence that the **BLACKBERRY** trademark has been the

subject of intense media attention. *See Coach Services Inc.*

*v. Triumph Learning LLC*, 96 USPQ2d 1600, 1610 (TTAB 2010),

*quoting Toro Co. v. ToroHead Inc.*, 61 USPQ2d 1164, 1180-81

(TTAB 2001) [" … examples of evidence to show the

transformation of a term into a truly famous mark include …

intense media attention … "]. As seen above, opposer

markets its goods and services in a wide variety of media,

all targeted to the general public. Moreover, opposer has

submitted representative figures of annual sales and

advertising expenditures for the United States in the decade

of 1999 to 2009, and especially 2004 to 2009. By mid-

decade, **BLACKBERRY** products had became ubiquitous in the

United States, and proved to be an important tool for

business executives, government officials and many other

professionals as a means for round-the-clock mobile

communications. Accordingly, we find that the term

**BLACKBERRY** is famous for handheld devices such as smart

---

Exhibit # 32, MillwardBrown Optimor's "Top 100 Most Powerful Brands '08," Bates Nos. RIM009520 and RIM009533, TTABVue Entry #54 at 189, 202 of 291; and Exhibit # 33, MillwardBrown Optimor's "Top 100 Most Powerful Brands '09," Bates Nos. RIM009549, RIM009554, RIM009556 & RIM009573, TTABVue Entry #54 at 218, 223, 225 & 242 of 291; Exhibit # 34, Bates Nos. RIM009636 & RIM009638, TTABVue Entry #54 at 259 & 261 of 291; and "Making It Big -- Not many cult brands evolve into national labels." Herewith, a select few that did. By Eileen Glanton, http://www.forbes.com/forbes/2001/0416/198b.html.

phones and closely-related information technology services, such as paging services, email service, wireless data messaging services, transmission and reception of voice communication services, and computer-related consulting and educational services.

### *Similarities of the marks*

We turn then to the *du Pont* factor dealing with the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005). The test under this *du Pont* factor is whether the marks are sufficiently similar that confusion as to the source of the goods and/or services offered under the respective marks is likely to result.

Both marks contain an unbroken string of ten letters broken into three syllables. Additionally, but for the first two letters, all the rest of the letters are identical. Despite this difference in the first two letters, we find that the similarities in appearance outweigh the differences. As to the aural similarities, while it has often been said that there is no "correct" way to pronounce a mark which is not an ordinary English-language word (such as applicants'), the stress and cadence

of the marks could be, and almost surely are, identical. With only a difference of two letters, applicants' own expert linguist, Dr. Butters, agrees that "there is certainly undeniable phonological similarity between BlackBerry and Crackberry.  They sound alike …."[18]  The first syllables of the respective marks ("black" and "crack") are undeniably similar in sound, and the balance of each mark is the identical word, "-berry."  Hence, we agree with applicants' expert that these marks have a similar sound.[19]

As to the connotations of these two marks, the record shows that the public at large initially adopted the nickname "CrackBerry," alluding to the widely-held view that users of **BLACKBERRY** wireless handheld devices often appear to be addicted to their device.[20]  The record shows that at least by 2005, the popular **BLACKBERRY** device had kicked-off a revolution in the United States – both technological and cultural.[21]  The "*CrackBerry*" moniker for **BLACKBERRY**

---

[18]    Butters Trial Deposition at 51-52.

[19]    Generally we find it unnecessary to rely upon linguistics experts to tell us how marks are pronounced.  *Plyboo America Inc. v. Smith & Fong Co.*, 51 USPQ2d 1633 (TTAB 1999); *Fisons Limited v. UAD Laboratories, Inc.*, 219 USPQ 661 (TTAB 1983); and *The Mennen Company v. Yamanouchi Pharmaceutical Co., Ltd*. 203 USPQ 302, 305, (TTAB 1979).  However, in this case, Dr. Butters was called by applicants to testify about the origins of the "Crackberry" term, and he then offered the quoted testimony concerning the aural similarities of the respective marks during cross-examination.

[20]    Michaluk Trial deposition at 65-69.

[21]    Potter Trial Deposition at 38-45.

branded products was selected as "Word of the Year" in 2006.[22] In short, because opposer's **BLACKBERRY** devices were widely referred to by the nickname, "*CrackBerry,*" prior to applicants' adoption of this mark, the two terms already had developed similar connotations.

As to commercial impressions, all of the evidence in the record, including the testimony of applicants' own witnesses, supports the conclusion that there is a strong association among members of the relevant public between these two terms in the field of wireless handheld devices. The fact that consumers and members of the public informally refer to **BLACKBERRY** devices by the "*CrackBerry*" moniker lends further support to our finding similar commercial impressions for both marks.

Accordingly, for purposes of this element, we find that the two involved marks are highly similar, and that this critical *du Pont* factor favors a finding of likelihood of confusion, particularly in light of the fame of the Blackberry mark:

> In a correct assessment of the *du Pont* factors, the fame of **PLAY-DOH** should have magnified the significance of these similarities [in the marks].

---

[22] *Webster's New World Dictionary* (2006); see also Butters trial deposition at 23-24.

*Kenner Parker Toys Inc. v. Rose Arts Industries, Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1457 (Fed. Cir. 1992). Thus, a potential consumer who is aware of opposer's famous mark is even more likely to be attuned to its similarity to applicants' mark upon encountering the latter.

### ***Goods and services***

Our inquiry into this *du Pont* factor is whether the goods and/or services are so related such that a consumer may believe the marks indicate that the goods and/or services emanate from a single source. *See On-line Careline Inc. v. America Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471 (Fed. Cir. 2000); *In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984); and *In re Opus One, Inc.*, 60 USPQ2d 1812 (TTAB 2001). As to the parties' respective goods and services, the evidence shows that opposer's marks are registered in connection with hand-held wireless devices, software, newsletters, and related telecommunications, consulting and educational services. Applicants are seeking registration for online retail store services featuring consumer electronics and telecommunication products and accessories, marketing services, an array of telecommunications, social media and Internet services, as well as a long listing of goods in International Class 25, namely items of clothing.

Applicants argue that opposer's registered marks are primarily in the field of hand-held wireless devices, software, and services essential to supporting these devices. By contrast, applicants take the position that they use their mark in connection with providing online chat rooms for users of opposer's devices as well as an online retail store service for wireless device accessories. Hence, applicants argue that there is no overlap between the goods and services of the parties. Furthermore, applicants argue that to the extent opposer's additional services have moved closer to applicants' core services, that as to these newer services, applicants actually maintain priority of use over opposer.

However, it is not necessary that the goods and services overlap in order to be found to be related in such a way that confusion is likely. For example, we find that applicants' "online retail store services featuring consumer electronics and telecommunications products … " are quite closely related to opposer's electronic handheld communication and data devices in International Class 9. "[T]here is no question that store services and the goods which may be sold in that store are related goods and services for the purpose of determining likelihood of confusion." *In re Peebles, Inc.,* 23 USPQ2d 1795, 1796 (TTAB

1992), *citing In re Best Products Co., Inc.,* 23 USPQ2d 988, 989 (TTAB 1988).

Moreover, we are constrained to consider applicants' entire listing of goods and services as presented, and they are much broader than "online chat rooms" and "online retail store service for wireless device accessories," as argued by applicants. Rather, we agree with opposer that applicants' recited services are closely related, if not, in some respects, legally identical, to opposer's broadly-stated goods and services, and this critical *du Pont* factor favors sustaining the oppositions. Likelihood of confusion must be found if there is likely to be confusion with respect to any item that comes within the identification of goods in the application. *See Tuxedo Monopoly, Inc. v. General Mills Fun Group*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981). For example, applicants' online services in International Class 38 appear to be virtually identical to opposer's registered services in International Class 38, i.e., services providing information that enable a user to employ wireless communications networks. Similarly, applicants' computer services of "redirecting electronic mail to changed personal electronic address" are closely related to opposer's services making possible the sending, receiving and synchronizing messages in a wireless environment. Applicants' website contains blogs, tips, discussion forums,

wallpaper, accessories and software, all using the

BlackBerry mark as if their own source identifier:



Based on this evidence, we find a close relationship

between opposer's registered goods and services and

applicants' recited services, such as online retail store

services, telecommunications, computer and educational

services.

Accordingly, as to the services recited in application

Serial Nos. 77059205, 77059214 [Opposition No. 91178668] and

77059232 [Opposition No. 91179490], we find this *du Pont*

factor strongly supports the position of opposer.

On the other hand, opposer claims common-law rights in

**BLACKBERRY** for use on items of clothing.  Such goods are

not covered by any of opposer's registrations. In addition to the fact that the record does not demonstrate that opposer's goods and services are related to applicants' items of clothing, we cannot be sure when opposer's use commenced because the record does not contain evidence that such usage was undertaken prior to applicants' International Class 25 filing date.[23] Accordingly, as to Opposition No. 9118076 to application Serial No. 77179267, we find that this *du Pont* factor does not support the position of opposer.

### *Channels of Trade*

As to trade channels, applicants argue that they operate in different channels of trade from those of opposer. However, we have to assume that the respective services will be rendered in all appropriate trade channels for such services, and we find ample evidence that all of these types of services are available through some of the same channels of trade.

---

[23] To the extent that opposer relies on its common law rights, it must prove its priority by competent evidence. We find under the rule of *Otto Roth & Co. v. Universal Food Corp.*, 640 F.2d 1317, 209 USPQ 40, 43 (CCPA 1981), that opposer cannot prevail unless its designation is, or has become, distinctive of its goods prior to the earliest date that respondent can rely upon, namely, the application filing date for her involved registration. *Towers v. Advent Software Inc.*, 913 F.2d 942, 16 USPQ2d 1039, 1041 (Fed. Cir. 1990).

Furthermore, applicants admit that they cater to the needs of users of opposer's **BLACKBERRY**-brand products and services, and designed their website to appeal to **BLACKBERRY** enthusiasts by providing content related to **BLACKBERRY** branded products, applications and accessories, and that their website was a preferred site for **BLACKBERRY** device owners when they experienced difficulties with their devices. Accordingly, opposer highlights the contradictory nature of applicants' arguments as to trade channels:

> " … Applicants simply cannot have it both ways. They cannot argue on the one hand that they operate one of the most popular websites [in the world] dedicated to **BLACKBERRY** owners … which provides **BLACKBERRY** related goods and services and at the same time claim that there is no overlap or similarity in channels of trade. Given the large number of channels in which **BLACKERRY** products and services are sold and the large audience of the **CRACKBERRY** website which is specifically targeted to **BLACKBERRY** enthusiasts, it is clear that the same consumers are encountering both marks in the marketplace."[24]

We agree with opposer's contention and find that there is a large overlap in the respective trade channels of opposer's registered goods and services and those of applicants' applied-for services. In fact, more than merely overlapping trade channels, it seems that applicants' marketing specifically targets opposer's actual customers,

---

[24] Opposer's rebuttal brief at 20.

explicitly referring to opposer and to opposer's marks. More than a mere overlap in *possible* customers, applicants' prospective customers are by design substantially all *prior* customers of opposer.

## *Conclusion on Likelihood of Confusion*

We conclude, based upon a preponderance of the evidence, after carefully weighing all the relevant *du Pont* factors, and particularly in view of the strength and fame of opposer's **BLACKBERRY** mark, the similarities between the marks, the relatedness of the respective goods and services as identified in the listings of goods and services, and their channels of trade, that there is a likelihood of confusion when applicants' **CRACKBERRY** mark is used in connection with the services recited in application Serial Nos. 77059205, 77059214 [Opposition No. 91178668] and 77059232 [Opposition No. 91179490].  Certainly, the fact that consumers and members of the public informally refer to **BLACKBERRY** devices by the "*CrackBerry*" moniker lends further support to our ultimate conclusion on a likelihood of confusion.  To the extent that we have considered any other of the relevant *du Pont* factors not otherwise mentioned, we consider them to be neutral.  Accordingly, we

sustain these oppositions on the basis of likelihood of confusion.

On the other hand, as to Opposition No. 91181076 to application Serial No. 77179267 involving the International Class 25 goods, we dismiss this opposition in the absence of a showing of a relationship between applicants' goods and the goods and services for which opposer has priority.

## *DILUTION BY BLURRING*

When an application to register a mark is challenged on grounds of dilution under Section 43(c) of the Act, 15 U.S.C. § 1125(c),[25] we look to the following elements:

---

[25] **(c) Dilution by blurring; dilution by tarnishment**
(1) Injunctive relief -- Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.
(2) Definitions
 (A) For purposes of paragraph (1), a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
 (i)  The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
 (ii)  The amount, volume, and geographic extent of sales of goods or services offered under the mark.
 (iii)  The extent of actual recognition of the mark.
 (iv)  Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.
 (B) For purposes of paragraph (1), "dilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.  In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:
 (i)  The degree of similarity between the mark or trade name and the famous mark.
 (ii)  The degree of inherent or acquired distinctiveness of the famous mark.

(1) whether the opposer's mark is famous; (2) whether the opposer's mark became famous prior to the date of the application to register the applicants' mark; and (3) whether the applicants' mark is likely to blur the distinctiveness of the opposer's famous mark.

A.  Is the term **BLACKBERRY** famous?

As noted above in our discussion of likelihood of confusion, we are convinced that the **BLACKBERRY** mark is famous based upon the ground breaking role of this device in shaping the culture and technology of the early twenty-first century, the incredible volume of sales, opposer's extensive promotional and advertising expenditures within the United States, and evidence of widespread media attention.

We are mindful of the fact that a higher standard of fame is required in the analysis of likelihood of dilution than is the case with fame in terms of likelihood of confusion.  *See Toro Co. v. ToroHead Inc.,* 61 USPQ2d 1164, 1170 (TTAB 2001).  Nonetheless, we find that the **BLACKBERRY** mark attained the levels of renown for which the dilution section of the statute was enacted.  We find based on this

---

(iii)  The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
(iv)  The degree of recognition of the famous mark.
(v)  Whether the user of the mark or trade name intended to create an association with the famous mark.
(vi)  Any actual association between the mark or trade name and the famous mark.

extensive record that **BLACKBERRY** should be ranked among the most famous and valuable trademarks in the world. *See* p. 12, Fn 17, *supra*.

Opposer's consistent history and tremendous volume of U.S. advertising and sales figures, coupled with the additional factors discussed above, supports the finding that **BLACKBERRY** has become a "household name" and is famous for dilution purposes. *See Thane International, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 64 USPQ2d 1564, 1575 (9th Cir. 2002) ["the transformation of a term into a truly famous mark" means that "the mark must be a household name."]. In fact, in their brief, applicants seem prepared to concede this point:

> In the instant case, … BlackBerry is a famous mark in relation to the goods and services in Opposer's pleaded registrations.

Applicants' brief at 33.

In view of the foregoing, we find the **BLACKBERRY** mark to be famous for purposes of this element of the likelihood of dilution analysis.

B.  Was the **BLACKBERRY** mark famous before applicants' filing date?

Applicants' involved intent-to-use applications were filed with the United States Patent and Trademark Office between December 2006 and May 2007. As noted *supra*, the record shows that between 1999 and 2005, the opposer's

**BLACKBERRY-**branded goods had kicked-off a technology revolution in the United States, that the **BLACKBERRY** mark is indeed famous, and that this fame was established before the filing dates of the affected applications, or any other date that applicants may be able to claim.  Hence, we find that the **BLACKBERRY** mark was famous before applicants' filing dates.

C.  Is applicants' mark **CRACKBERRY** likely to blur the distinctiveness of the opposer's **BLACKBERRY** mark?

Dilution by blurring is an association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.  Trademark Dilution Revision Act of 2005, 15 U.S.C. § 1125(c)(2)(B) [TDRA].  Over time, the gradual whittling away of distinctiveness will cause the trademark holder to suffer "death by a thousand cuts."[26]  Accordingly, we consider the statutory, non-exclusive factors for determining the likelihood of blurring in a dilution case set out by the TDRA.

---

[26]    *See National Pork Board v. Supreme Lobster and Seafood Co.*, 96 USPQ2d 1479, 1497 (TTAB 2010)(citing Barton Beebe, "A Defense of the New Federal Trademark Antidilution Law," 16 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 1143, 1163 (2006)).

#### *The degree of similarity between the mark or trade name and the famous mark.*

One of the questions in a dilution case is whether the two involved marks are sufficiently similar to trigger consumers to conjure up a famous mark when confronted with the second mark. It is not necessary that the marks be substantially identical. Rather, for purposes of this element, it is sufficient that the terms be highly similar. *UMG Recordings Inc. v. Mattel Inc*., 100 USPQ2d 1868, 1888 (TTAB 2011) [**MOTOWN** versus **MOTOWN METAL]** and *Nike Inc. v. Maher*, 100 USPQ2d 1018 (TTAB 2011) [**JUST DO IT** versus **Just Jesu it**] .

While we are not conducting a Section 2(d) likelihood of confusion analysis under this factor of dilution by blurring, we still consider the degree of similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *See also UMG Recordings Inc.* 100 USPQ2d at 1888; *Coach Services Inc. v. Triumph Learning LLC*, 96 USPQ2d 1600, 1613 (TTAB 2010); and *National Pork Board*, 96 USPQ2d at 1497 (TTAB 2010).

In connection with our Section 2(d) analysis, we have already found it significant that the public at large initially adopted the nickname "*CrackBerry*" for **BLACKBERRY** wireless handheld devices. That is, prior to the filing of

the involved applications, the "*CrackBerry*" moniker for

**BLACKBERRY** branded products had already achieved

dictionary status as a slang term dating to the year 2000,[27]

and had then been selected "Word of the Year" (2006) by the

staff of *Webster's New World Dictionary*.[28]

We found above in our likelihood of confusion

discussion that applicants' mark, upon adoption, carried

with it a connotation and commercial impression most similar

to that of opposer's famous mark in the field of wireless

handheld devices.  Hence, as to this factor of the

likelihood of dilution, we find that there is a high degree

of similarity between applicants' mark and opposer's famous

mark.  As noted earlier, applicants have conceded this

factor in connection with their parody defense.

> In the instant case, the first four elements
> are truly not in dispute.  The term
> CRACKBERRY is a nickname for the BlackBerry
> device and because of the same some
> similarities between the marks exist.  It is
> conceded that BlackBerry is inherently
> distinctive for the goods and services in
> Opposer's pleaded registrations and that the
> global brand value for the BlackBerry
> trademark in conjunction with the Opposer's
> submission of evidence of their marketing
> efforts and expenditures on advertising is
> sufficient to establish that BlackBerry is a
> famous mark in relation to the goods and
> services in Opposer's pleaded registrations.

Applicants' brief at 33.

---

[27]    Butters trial deposition at 23-24.
[28]    Id.

### *The degree of distinctiveness of the famous mark.*

As noted above, applicants have conceded that the term **BLACKBERRY** is inherently distinctive as applied to opposer's devices, and there is no evidence that it is weak in any other respect. We find it to be distinctive, and resolve this element in opposer's favor.

### *The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.*

There is nothing in this record which contradicts opposer's position that its use of the **BLACKBERRY** mark is virtually exclusive in this field. Opposer has shown that it has used the mark extensively for more than a decade, and applicants have not shown that there are any third-party uses. In fact, there is no evidence in this record of any actual use in commerce, at the time applicants filed their applications for a federal trademark registration or since, of the same or highly similar marks, on any goods or services, and certainly not of goods or services that are related to wireless handheld devices. Accordingly, opposer's exclusivity of use of this mark also supports the conclusion that dilution by blurring is likely.[29]

---

[29] Again, we note that applicants have essentially conceded this factor in connection with their parody defense. Applicants' brief at 33.

### *The degree of recognition of the famous mark.*

The fourth listed statutory factor for the blurring analysis requires us to assess just how well-recognized is opposer's mark. The evidence opposer has placed into this record is extensive. The preponderance of this evidence convinces us that between 1999 and 2004 the **BLACKBERRY** mark became one of the most prominent marks in our digital, wireless culture. Although the actual numbers are confidential, opposer has spent huge sums of money advertising and promoting its **BLACKBERRY** mark in the United States. We also find especially compelling the billions of dollars worth of **BLACKBERRY** branded products and services sold at retail in the United States to tens of millions of consumers in the United States over the past dozen years. Furthermore, we have already found that **BLACKBERRY** should be ranked among the most famous and valuable trademarks in the world. See pp. 12-14, *supra*.[30]

### *Whether the user of the mark intended to create an association with the famous mark.*

We agree with opposer that the evidence of record very clearly supports the conclusion that applicants intended to create an association with RIM's famous **BLACKBERRY** mark in

---

[30] Again, we note that applicants have essentially conceded this factor in connection with their parody defense. Applicants' brief at 33.

choosing to adopt **CRACKBERRY** as their source indicator. Several of applicants' services are closely related to the goods and services recited in RIM's registrations. As seen earlier, the purpose of applicants' online services is to provide a forum for **BLACKBERRY** users, and they provided advice on using (and abusing) the device. The record demonstrates that consumers were well acquainted with **BLACKBERRY** devices, and the degree to which the media had amplified the cultural buzz that had built up around them. Indeed, it is significant to our findings on this factor that applicants' corporate representative, Kevin Michaluk, confirmed that applicants chose this term precisely because of its strong association with **BLACKBERRY**.[31] Finally, as argued by opposer, applicants' persistent claims of an attempted parody stands as an admission that applicants intended to create an association with BlackBerry.

### *Any actual association between the mark and the famous mark.*

In this case, we find that applicants intentionally chose a designation already strongly associated with the famous mark of the opposer. Under the circumstances, it is clear that applicants were well aware of this pre-existing association at the time they adopted it. The testimony from

---

[31]    Michaluk trial deposition at 69.

applicants' own witnesses confirms that there was such an association.

As previously noted, the record shows that the public at large initially adopted the term "*CrackBerry,*" as a nickname for opposer's goods, alluding to the widely-held view that users of **BLACKBERRY** wireless handheld devices often appear to be addicted to their device. The record shows that at least by 2005, opposer's **BLACKBERRY** goods and services had achieved considerable fame in the United States due to its technological innovation and the changes its wireless connectivity made possible. Again, the "*CrackBerry*" moniker for **BLACKBERRY** branded products was selected as "Word of the Year" in 2006 by the staff of *Webster's New World Dictionary*. All the evidence in the record, including the testimony of applicants' own witnesses, supports the conclusion that there is a strong association among members of the relevant public between these two terms in the field of wireless handheld devices and related services. Hence, we find in this context, that there existed a strong association between **BLACKBERRY** and **CRACKBERRY** well prior to the date on which applicants adopted this latter mark as their own.

### *BALANCING THE FACTORS*

Accordingly, after considering the entire record and the parties' arguments herein, we find that all six of the listed statutory factors support the position of opposer herein, that RIM is likely to suffer impairment of the distinctiveness of its marks, and hence, opposer has shown a likelihood of dilution by blurring under Trademark Act § 43(c)(2)(B), 15 U.S.C. § 1125(c)(2)(B) as to each of the applications opposed.

## Applicants' claims of Parody

The arguments that applicants put forward most zealously in their final brief is that they are attempting to satirize opposer's famous mark, using a moniker admittedly preexisting in the population at large. Consistent with the argument that their mark is a protectable parody, applicants have effectively conceded much of opposer's case on a likelihood of dilution, as seen above.

Applicants are correct that parody is explicitly included as a defense to a claim of dilution under a statutory "fair use" exclusion in Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)(3)(A):

(3) *Exclusions*. --The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection:

(A) Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person *other than as a designation of source for the person's own goods or services*, including use in connection with--

(i) advertising or promotion that permits consumers to compare goods or services; or

(ii) identifying and *parodying*, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

(B) All forms of news reporting and news commentary.

(C) Any noncommercial use of a mark.

As emphasized by Professor McCarthy, "The parody safe harbor is obviously intended to accommodate the interests of using famous marks in free speech and expression."[32]  Yet, as is the case with substantially all trademark applicants seeking federal registrations from the United States Patent and Trademark Office, applicants herein are necessarily relying upon a claim of using the parody as a designation of source for its own services (and/or goods).  By the very terms of the statute, applicants' claimed use as a mark seems to be precluded from the safe harbor provisions.

Nonetheless, as support for their position that parody is a form of fair use and is a complete defense, applicants

---

[32]    J.T. McCarthy, 4 McCarthy on Trademarks and Unfair Competition § 24:126 (2010).

point to a case from the Fourth Circuit Court of Appeals, *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 84 USPQ2d 1969 (4th Cir. 2007).[33] Applicants argue from the *Louis Vuitton* decision that we should impose on plaintiff/opposer an "increased burden" to demonstrate that the distinctiveness of its famous mark is likely to be impaired by this parody. We disagree with this approach.

As opposer argues, based on the *Louis Vuitton* case, the safe harbor provision does not extend the fair use defense to parodies used as a trademark. "Under the statute's plain language, parodying a famous mark is protected by the fair use defense only if the parody is not 'a designation of source for the person's own goods or services.'" *Louis Vuitton,* 84 USPQ2d at 1978. *See also American Express Marketing & Development Corp. v. Gilad Development Corp.*, 94 USPQ2d 1294, 1298-1300 (TTAB 2010). However, as the *Louis Vuitton* decision notes, that observation does not end the inquiry. Like the Fourth Circuit, the Board will assess

---

[33]  In this case, defendants' **CHEWY VUITON** mark for pet chew toys was chosen as a joking reference to plaintiff's luxury **LOUIS VUITTON** handbags. Given the rhyming marks, the trade dress, etc., the Court found that Haute Diggity Dog intended an irreverent parody, and that this parody was permitted as a "fair use" exception to the rule against dilution by blurring.

We note that this case has on occasion come under criticism. *See, e.g.,* Anthony L. Fletcher, "The Product with the Parody Trademark: What's Wrong with CHEWY VUITON?" 100 TRADEMARK REPORTER 1091 at 1142-45 (September-October 2010).

the alleged parody "as part of the circumstances to be considered for determining whether the [opposer] has made out a claim for dilution by blurring." *Louis Vuitton*, 84 USPQ2d at 1978.

We find the alleged parody does not, in this case, insulate the applicant from the claim of dilution. Specifically, we find two factors undercut the effectiveness of the claimed parody in averting dilution. First, and most important, the public itself adopted and popularized "*CrackBerry*" as a nickname for **BLACKBERRY** wireless handheld devices. The name does not solely – if at all – reflect applicants' asserted attempt to parody opposer's marks. This circumstance alone materially distinguishes this case from the *Louis Vuitton* decision. Second, applicants' use of "*CrackBerry*" on services that are for the most part closely related to opposer's goods and services significantly undercuts the effectiveness of the asserted parody in avoiding dilution by blurring. Indeed, one of the core reasons that "Chewy Vuiton" was held to be an effective parody was its "juxtaposition of the similar and the dissimilar": a "furry little imitation to be *chewed by a dog*" and the "elegance and expensiveness of a LOUIS VUITTON handbag, which must *not* be chewed by a dog." *Id*. at 1974 (*emphases* in original); see also *Id*. at 1979-80.

Accordingly, on this record, we find that applicants' use of opposer's "*CrackBerry*" nickname to market its services, sell items of clothing, etc., would blur the distinctiveness of the **BLACKBERRY** marks, rather than create a non-source-indicating fair use parody that should be protectable either under the safe harbor provisions of Section 43(c)(3)(A) or of the First Amendment.

Therefore, all four of these oppositions are sustained on the ground that opposer has shown a likelihood of dilution by blurring under Trademark Act § 43(c)(2)(B).

*Decision:* The first three of these oppositions are sustained on the ground of likelihood of confusion, and all four of the oppositions are sustained on the ground of likelihood of dilution by blurring, and as a result, registration to applicants is hereby refused in all four **CRACKBERRY** applications involved herein.